IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| CLARISSA D. BROWN, | ) | Civil Action No. 3:10-2681-HMH-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the Court pursuant to Local Civil Rules 73.02(B)(2)(a) and 83.VII.02, <u>et</u> <u>seq.</u>, DSC, concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

## ADMINISTRATIVE PROCEEDINGS

Plaintiff applied for DIB on October 29, 2007 and SSI on July 27, 2007, alleging disability commencing on September 6, 2001.[1]  Plaintiff's claims were denied initially and upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). Plaintiff (represented by counsel) appeared and testified at hearing held on October 20, 2009.[2]  A

---

[1]Plaintiff originally alleged an onset date of January 1, 2000 which was later amended (<u>see</u> Tr. 9, 44-45). Plaintiff previously filed applications for disability benefits which were denied by an ALJ on September 5, 2001, after which the Appeals Council denied Plaintiff's request for review.

[2]Toward the end of the hearing, Plaintiff became upset and the hearing was discontinued prematurely. Plaintiff's counsel and the ALJ, however, conceded that they had no more questions for Plaintiff such that there was no need to have Plaintiff come back and testify any further. <u>See</u> Tr. 71, 73.

supplemental hearing, at which a vocational expert ("VE") appeared and testified, was held on December 7, 2009. Plaintiff, through her attorney, waived her right to appear at the supplemental hearing, but was represented at the supplemental hearing by her attorney.[3] On January 13, 2010, the ALJ issued a decision denying benefits and finding that Plaintiff was not disabled because work exists in the national economy which Plaintiff could perform.

Plaintiff was forty-eight years old at the time of the ALJ's decision. She has a high school education and past relevant work as a shipping plant packer, school custodian, nurse aid, and janitor. Plaintiff alleges disability due to shortness of breath of uncertain etiology, a seizure disorder, and a gait abnormality.

The ALJ found (Tr. 11-20):

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2005, but not thereafter.

2.     The claimant has not engaged in substantial gainful activity since January 1, 2000, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971, *et seq.*).

3.     The claimant has the following severe impairments: shortness of breath of uncertain etiology, a seizure disorder, and a gait abnormality (20 CFR 404.1520 (c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a significant range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). Specifically, the claimant is able to lift and carry up to 10 pounds

_____

[3]Plaintiff's attorney requested that the ALJ recuse herself informally and formally, which the ALJ denied. The ALJ stated that she was fairly and objectively able to determine the issue of whether Plaintiff is disabled. See Tr. 9.

occasionally and lesser amounts frequently, sit for 6 hours in an 8-hour day, and stand and walk for 2 hours in an 8-hour day for 15 to 30 minutes at a time. The claimant is able to read, write, add, and subtract. She must avoid uneven surfaces and can push and pull within the pound limitations above. She can occasionally climb stairs and ramps but must avoid ropes, ladders, and scaffolds. The claimant can frequently kneel, stoop, balance, crouch, and crawl. She must avoid concentrated exposure to extremes of heat and cold, fumes, odors, gases, and poor ventilation (including any pulmonary irritants in excess of an office setting). The claimant must also avoid hazards and unprotected heights.

6.    As a result of her residual functional capacity as described above, the claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on June 29, 1961, and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from September 6, 2001 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The Appeals Council denied the request for review in a decision issued September 24, 2010.

Accordingly, the ALJ's decision became the final decision of the Commissioner. Plaintiff then filed

this action in the United States District Court on October 15, 2010.

The only issues before this Court are whether correct legal principles were applied and

whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v.

3

Perales, 402 U.S. 389 (1971); Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C.

§§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff

has the burden of proving disability, which is defined as "the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of

not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a); see also Blalock v. Richardson,

supra.

## **MEDICAL EVIDENCE**

Plaintiff was treated for seizures as early as 1987, after the birth of her third child.  See Tr.

758.  A CT scan on May 30, 1991 showed mild cerebellar atrophy consistent with chronic

anti-convulsant therapy.  Tr. 749.  She was treated at East Cooper Regional Medical Center ("East

Cooper") twice in 2000 following seizures.  Tr. 514, 516.  On December 4, 2000 she was treated at

East Cooper for ear and lip lacerations following an altercation/assault.  Tr. 511.

An arterial study was negative for vascular disease on February 9, 2001.  Tr. 473.  A chest

x-ray was normal on March 12, 2001.  Tr. 472.  Plaintiff underwent a skin graft procedure at East

Cooper on March 12, 2001, approximately five weeks after she had a seizure and burned her foot on

a kerosene heater.  Tr. 702.

From July to December 2000, Plaintiff received treatment at Carolina Neurological Clinic

for  her seizure disorder.  Tr. 1131-1143.  On February 16, 2001, it was noted that Plaintiff had

suffered a seizure and that noncompliance may have caused the event.  Tr. 1213.  Plaintiff underwent

a hysterectomy at the Medical University of South Carolina ("MUSC") on August 30, 2001, after

imaging showed small uterine fibroids and left ovarian cysts.  Tr. 369, 546. After a seizure on

October 6, 2001, Plaintiff underwent a CT scan that revealed no acute abnormality. Tr. 507-508. An MRI of Plaintiff's back at MUSC revealed left predominate disc herniation at L3/4 without nerve root compression on February 22, 2002. It was noted that no other symptoms were found to explain Plaintiff's complaints of back pain. Tr. 885.

Echocardiography testing from MUSC on March 5, 2002 was noted to be normal. Tr. 542. Plaintiff complained that Neurontin made her drowsy, and it was noted that she refused doctors' instructions to stop taking Phenobarbital. Plaintiff stated that she continued to take the medication because it helped her relax. Tr. 892.

Plaintiff was examined for pelvic pain on March 26, 2002. An ultrasound revealed a cyst on her left ovary, but no abnormalities on the right. Tr. 371. Chest x-rays on April 4, 2002 were unremarkable. Tr. 896. An ultrasound dated April 24, 2002 revealed persistent complex left ovarian cyst, possibly hemorrhagic, multiple right ovarian cysts, and moderate free fluid in her pelvis. It was recommended that she follow up in four to six weeks. Tr. 372. Later that day she was treated at East Cooper after experiencing a seizure. Tr. 504. In a letter dated April 28, 2002, a neurologist at the Carolina Neurology Clinic opined that Plaintiff should be evaluated to determine whether she was actually having epileptic seizures. Tr. 897.

On May 10, 2002, Plaintiff was taken to East Cooper via ambulance after her brother found her in the bathtub in a semi-responsive state. Tr. 502. She underwent six days of EEG testing from May 14 to 20, 2002. It was noted that she did not experience any seizures during that time. Tr. 860. On August 8, 2002, Plaintiff reported she had several seizures. A CT scan of her brain was noted to be normal with no change when compared to the October 6, 2001 imaging. Tr. 501.

On July 9, 2002, Plaintiff was examined at MUSC.  She reported she had been diagnosed with generalized anxiety disorder in the past, but did not want to take medication and refused a psychiatric follow-up at MUSC on that date.   Staff noted that Plaintiff had "mood stabilization issues."  Chest x-rays were negative for any findings of lung disease.  Tr. 906.

Notes from the Pulmonary Department at MUSC dated September 9, 2002, ruled out pulmonary embolus, vasculitis, and sarcoidosis.  No cause for Plaintiff's complaints of shortness of breath was found.  Tr. 539.  On September 28, 2002, Plaintiff reported an episode of syncope during which she fell down and injured her arm.  She told staff she stopped taking Neurontin five days prior to the incident.  Tr. 497.

After a seizure during which she hit her head, Plaintiff was treated at East Cooper on November 24, 2002.  She reported she had run out of Dilantin ten days prior and could not afford to refill her prescription.  Tr. 495.  She was transported to East Cooper via ambulance after an unwitnessed seizure on December 11, 2002.  Tr. 493.

On January 1, 2003, Plaintiff reported back pain lasting three days.  Tr. 490.  X-rays of Plaintiff's lumbar spine taken at East Cooper that day were unremarkable.  Tr. 492.  On March 7, 2003, medical personnel at East Cooper ER noted that Plaintiff had experienced a seizure which was attributed to medication non-compliance.  Tr. 488-489.

Plaintiff was evaluated at the MUSC Department of Otolaryngology, Head, and Neck Surgery on April 1, 2003.  She reported a three-year history of shortness of breath, usually brought on by exertion.  She said she had weakness in her lower extremities, loss of appetite, and decreased energy.  Dr. Khanh-Gien Hoang noted that Plaintiff's symptoms were not due to any abnormality in the upper aerodigestive tract.  Tr. 375-376.

6

Plaintiff was admitted to MUSC for shortness of breath on April 29, 2003, but no cause was found for her symptoms. Tr. 533-534. Right heart catheterization on May 1, 2003 was unremarkable. Tr. 378. It was noted that she took Dilantin, Phenobarbital, Keppra, and Neurontin for seizures. Tr. 379. Echocardiography testing at MUSC was within normal limits on May 12, 2003. Tr. 532.

On May 13, 2003, Plaintiff was treated at East Cooper after an episode of syncope attributed to anxiety. Tr. 486-487. On May 24, 2003, Plaintiff was admitted to East Cooper after a family member found her on the floor due to a possible seizure. Her Dilantin level was subtherapeutic even though Plaintiff claimed she was compliant with her medication. Tr. 484-485.

Plaintiff went to the East Cooper ER via ambulance on August 26, 2003, after an episode of syncope. Tr. 482. Plaintiff was treated at the MUSC Ambulatory Care Services/Neurology Department after a seizure on January 23, 2004. Tr. 403. Plaintiff was treated by Dr. James E. Fulcher on August 9 and September 8, 2003. Tr. 410, 412.

At an examination at MUSC on February 25, 2004, Plaintiff reported she was there to discuss tests results. Staff noted that the tests in question where not ordered by the physician or her clinic. Plaintiff declined injections for pelvic pain due to concern about interaction with her seizure disorder. She was described as angry and argumentative when staff told her they did not have test results. She agreed to take Lupron for pelvic pain. Tr. 391. On April 23, 2004, notes indicate Plaintiff declined to take Lupron due to concerns about hypercoagulability despite assurances by physicians that there was no such risk. Aygestin and Letrazole were prescribed. Tr. 393. She reported on June 4, 2004 that she received no relief from the prescribed medications. Laparoscopy was discussed as the only viable alternative to pharmacological intervention. Tr. 395-396. At

7

MUSC on November 19, 2004, it was noted that Plaintiff was on continuous oxygen due to severe pulmonary disease of unknown etiology.  Tr. 398.  On December 7, 2004, Plaintiff reported she experienced three seizures during the previous week, each lasting ten to twenty minutes.  Tr. 400.

Plaintiff was transported to East Cooper via ambulance on April 2, 2004 following a seizure which occurred after she failed to take her medication that day.  She had a brief seizure while there. Tr. 474-475.  On May 18, 2004, Plaintiff told Dr. Fulcher's staff that she "went blank" and got lost in Charleston the day before.  Tr. 415.

On August 5, 2004, Plaintiff was examined at MUSC Rehabilitation Services for an abnormal gait.  Tr. 853.  Therapeutic exercise was prescribed, bi-weekly for eight weeks.  Tr. 853-854.  On September 16, 2004, Plaintiff reported to Dr. Fulcher that she experienced a seizure on September 9, 2004.  She complained of pain in her hips after physical therapy sessions.  Tr. 416.

On January 18, 2005, Plaintiff reported to Dr. Fulcher that she had hip pain, difficulty sleeping, and headaches after discontinuing Phenobarbital.  Tr. 417.  EEG testing at MUSC was normal on February 1, 2005.  Tr. 382.  On March 4, 2005, Plaintiff told Dr. Fulcher that she experienced three seizures the day before.  Tr. 418.  Notes from East Cooper indicate Plaintiff was examined after a seizure on April 17, 2005.  Tr. 478.  A consultative examination at West Ashley Family Medicine was performed on May 4, 2005.  It was noted that minimal records were available. A review of physical symptoms was essentially normal.  Tr. 419.

On July 15, 2005, Plaintiff reported to MUSC staff that she had right-sided burning pain which was increasing in intensity and unrelieved by medication.   Decreased sensation was noted on her right side, leg greater than arm.  Tr. 986-989.  A bilateral chest x-ray from East Cooper was unremarkable on July 18, 2005.  Tr. 471.  On July 22, 2005, an MRI of Plaintiff's spine revealed

8

degenerative changes at C3-4 through C6-7 without significant narrowing of the neural foramina or signs of nerve compression.  Tr. 992.  A consultative chest x-ray dated August 9, 2005 was normal. Tr. 424.

Plaintiff was hospitalized at MUSC for shortness of breath from November 8 to 11, 2005. All testing was within normal limits and no cause for her symptoms was found.  Tr. 525-526.  An MRI of Plaintiff's brain showed mild cerebellar atrophy on December 1, 2005.  Tr. 1027.

On December 13, 2005, notes at MUSC indicate that Plaintiff had severe desaturation (lack of oxygen) with minimal ambulation, but normal resting oxygen levels.  Tr. 568.  A diagnosis of asthma was suggested and Plaintiff was referred for a sleep study to evaluate possible periodic limb movement and narcolepsy symptoms.  It was noted that Plaintiff was found to have moderately severe obstructive lung disease during her November 2005 hospitalization.  She reported peripheral neuropathy and complained that her leg jumped at night, keeping her awake.  Tr. 568-570.

On January 20, 2006, Plaintiff told staff that she needed to stay on Keppra to prevent headaches and Elavil for anger management.  Tr. 564.  On January 24, 2006, Plaintiff reported to Dr. Fulcher that she was having outbursts of anger and felt strange. Tr. 463.   On February 7, 2006, Dr. Fulcher reported to the South Carolina Department of Social Services  that Plaintiff had epilepsy and could not drive. He noted that she suffered from loss of consciousness and had a chronic somatization disorder.   His prognosis for her issues was "temporary and total." Tr. 465. Somatization disorder was recorded again on a "permanent problem list" included with Plaintiff's records from Dr. Fulcher's office as was "grand mal seizure disorder."  Tr. 468.

On April 1, 2006, Plaintiff was taken by ambulance to East Cooper after a seizure.  It was noted she had missed her evening medication.  Tr. 480.  Treatment notes from MUSC dated April

9

18, 2006, indicate that after a "very extensive work-up" the cause of Plaintiff's respiratory difficulties could not be determined.  Tr. 560.

On May 5, 2006, Plaintiff reported slightly less seizure frequency.  She told staff that she was taking Elavil for sleep, but agreed to try a different medication when it was explained that this medication could lower her seizure threshold.  Tr. 973.  Plaintiff reported to MUSC Pulmonary that she was doing very well on Advair on June 14, 2006.  It was noted that her shortness of breath might be related to asthma.  Tr. 977.

On June 29, 2006, Dr. Judith Von, a State agency psychologist, completed a Psychiatric Review Technique form in which she found that Plaintiff had an affective disorder, but that this disorder was "not severe."  She opined that Plaintiff's affective disorder would result in mild difficulties in maintaining social functioning, but was otherwise not functionally limiting.  Tr. 625-636.

Scans of Plaintiff's lungs on August 26, 2006 were unremarkable, as was a chest CT.  Tr. 995-996.  On September 20, 2006, her oxygen was increased from two to four liters.  Tr. 998.

During a neurological follow up consultation at MUSC on March 23, 2007, it was noted that Plaintiff's complaints and diagnoses remained essentially unchanged.  Tr. 1031-1033.  On March 27, 2007, a physician at MUSC's Pulmonary Department noted that although he had discontinued Plaintiff's oxygen use, Plaintiff continued to use it and titrate up and down to make herself feel better.  Tr. 1034.

Plaintiff was treated at Roper Hospital for back pain on June 16, 2007.  She was instructed to take Ibuprofen, and it was noted that she had possible arthritis.  Tr. 1312-1313.  She was treated at East Cooper ER for blisters on her face caused by hot grease on December 3, 2007.  Tr. 1325.

Plaintiff underwent a consultative physical evaluation on January 17, 2008. Dr. Harriett Steinert opined that Plaintiff could not do any strenuous activities or walking due to Plaintiff's reported oxygen use. She also thought that Plaintiff could do no climbing, lifting, carrying, stooping, or bending due to her arthritis in her right knee and hip. Dr. Steinert also opined that Plaintiff could handle her own personal financial and legal affairs. Tr. 1448-1449.

On February 8, 2008, State agency psychologist Dr. Jeffrey Vidic reviewed Plaintiff's records and completed a Psychiatric Review Technique form in which he opined that Plaintiff had an affective disorder which was not severe and would only result in mild difficulties in maintaining social functioning. He noted that Plaintiff had never received formal psychiatric treatment and had a normal mood and affect. Tr. 1459-1472.

On April 2, 2008, Plaintiff was examined at MUSC Pulmonary. It was noted she had been told at a previous visit to discontinue her oxygen use due to risk of lung injury. She told staff her Medicaid coverage had run out. When staff questioned her about the use of oxygen, she became "very belligerent, angry, abusive, and insulting." She was noted to be in some respiratory distress. It was noted that they would no longer prescribe her oxygen. Tr. 1590-1591.

Treatment notes from St. James-Santee Family Health Center on September 17, 2009 indicate that Plaintiff was "a bit animated and manic and could not stay on topic." Dr. Alfred Daniels was unsure why Plaintiff took Elavil or Effexor and opined that she did not need oxygen but that she seemed to derive some emotional comfort from it. Tr. 1633. On April 8, 2009, Plaintiff reported to staff at James-Santee that she got her seizure medications from Crisis Ministries. Tr. 1636.

Between September 2005 and June 2008, four State agency physicians assessed Plaintiff's work abilities. Tr. 454, 640, 1452, 1598. Drs. Charles Fitts and William Cain limited Plaintiff to

11

lifting fifty pounds occasionally and twenty-five pounds frequently. Tr. 454, 1452. Drs. Dale Van Slooten and Jim Liao limited Plaintiff to lifting twenty pounds occasionally and ten pounds frequently. Tr. 640, 1598. They all opined that Plaintiff could stand and walk for up to six hours in an eight-hour workday, and could sit for up to six hours in an eight-hour workday. Tr. 454, 640, 1452, 1598. They limited her to only occasional climbing of ramps and stairs, and no climbing ladders, ropes, or scaffolds. Tr. 455, 641, 1453, 1599. All four examiners opined that she should avoid all hazards. Tr. 457, 643, 1455, 1601.

## HEARING TESTIMONY

Plaintiff testified that her daughter drove her to the hearing because her doctor advised her it was not safe for her to drive. Tr. 54. She said she could read a newspaper, but could not focus. Plaintiff testified that she could write, add, and subtract. Tr. 55.

Plaintiff testified to past jobs as a line packer (packing and shipping containers on an assembly line), a kitchen worker, and working for a cleaning company. She also alluded to working as a security guard. Tr. 55-97. Plaintiff stated she could not return to work because she experienced blackouts. She said her seizures were brought on by activity and she experienced them three to four times per week. Tr. 58. Plaintiff testified that she sometimes went to the emergency room, but that her Medicaid had been discontinued. She said she only saw a physician after a seizure if she hurt herself during the episode. See Tr. 58-62.

Plaintiff said she could not lift things because if she did not grip correctly she would black out. Tr. 62. She testified that she could not stand too long because her right leg sometimes gave out. Tr. 63. Plaintiff said that if she stood for more than thirty minutes, she experienced burning in her feet. Tr. 64. She said she could not return to work because she would "end up not a dependable

person." In her estimation, she could lift a baby, which she estimated weighed fifteen pounds. Tr.

65. Plaintiff stated that she could not remember things and that she sometimes lost her direction.

Tr. 66.

## DISCUSSION

Plaintiff argues that the ALJ failed to perform a proper listing analysis and failed to order a

consultative examination. The Commissioner contends that the ALJ's analysis of Plaintiff's alleged

somatoform disorder was reasonable and supported by substantial evidence[4] and that there was no

need to order an additional consultative examination.

A.    Listings

Plaintiff asserts that the ALJ erred in failing to find that she met the Listing of

Impairments ("Listings"), 20 C.F.R. Pt. 404. Subpt. P., App. 1, at § 12.07 (somatoform disorders).

The Commissioner contends that the ALJ did not err as she expressly considered Plaintiff's alleged

somatoform disorder and weighed the evidence in reaching her conclusion that Plaintiff did not have

a somatoform disorder and therefore did not meet the relevant Listing.

Plaintiff fails to show that she met or equaled the Listing at § 12.07. Contrary to Plaintiff's

argument, the ALJ was not required to specifically discuss whether Plaintiff met or equaled this

---

[4]Substantial evidence is:
> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

listing, as she did not find that Plaintiff's somatoform impairment was a "severe"[5] impairment at step two of the sequential evaluation process.[6]   The ALJ was not required to provide such additional findings with respect to non-severe impairments (including Plaintiff's somatoform impairment). Rather, the ALJ must consider all of Claimant's impairments in combination, including those which are not severe, as the ALJ did here. SSR 96-8p (In considering Claimant's residual functional capacity, the ALJ must consider the "limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.' "); see Hill v. Astrue, No. 3:09-cv-00705, 2010 WL 3813258 (S.D.W.Va. Sept. 27, 2010)(ALJ did not err by failing to discuss whether claimant's COPD met a listing where the ALJ found that claimant's COPD was not a "severe" impairment and

---

[5]It is the claimant's burden to show that he or she had a severe impairment.  See Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987).  A non-severe impairment is defined as one that does not "significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).    "Basic work activities" are defined as:

> the abilities and aptitudes necessary to do most jobs.  Examples of these include --
>> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>> (2) Capacities for seeing, hearing, and speaking;
>> (3) Understanding, carrying out, and remembering simple instructions;
>> (4) Use of judgment;
>> (5) Responding appropriately to supervision, co-workers and usual work situations; and
>> (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b).  An impairment is "not severe" or insignificant only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

[6]In evaluating whether a claimant is entitled to disability insurance benefits, the ALJ must follow the five-step sequential evaluation of disability set forth in the Social Security regulations. See 20 C.F.R. § 404.1520.  The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether the claimant retains the capacity to perform specific jobs that exist in significant numbers in the national economy.  See id.

14

considered all of claimant's severe and non-severe impairments in combination).  As discussed further below, the ALJ properly considered Plaintiff's combination of impairments.

Additionally, even if the ALJ erred in not specifically discussing the somatoform Listing, any error is harmless as Plaintiff fails to show that she met or equaled this Listing.  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria."  Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also have the findings shown in the listing of that impairment.  20 C.F.R. § 404.1525(d); see Bowen v. Yuckert, 482 U.S. 137, 146 and n. 5 (1987)(noting the claimant has the burden of showing that his impairment is presumptively disabling at step three of the sequential evaluation and that the Act requires him to furnish medical evidence regarding his condition).  The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment.  Medical equivalence can be found if the impairment(s) is/are at least equal in severity and duration to the criteria of any listed impairment.  20 C.F.R. § 404.1526(a).  A claimant has to establish that there was a "twelve-month period...during which all of the criteria in the Listing of Impairments [were] met."  DeLorme v. Sullivan, 924 F.2d 841, 847 (9th Cir. 1991)(finding that the claimant's back impairment did not meet the requirements of section 1.05C; remanded on other grounds).

This Listing at § 12.07 provides:

Somatoform Disorders: Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.
The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
    A. Medically documented by evidence of one of the following:

1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or

2. Persistent nonorganic disturbance of one of the following:
    a. Vision; or
    b. Speech; or
    c. Hearing; or
    d. Use of a limb; or
    e. Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia; or
    f. Sensation (e.g., diminished or heightened).

3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;

And

B. Resulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07.

Plaintiff has not shown that she meets the "A" criteria of § 12.07. Although Dr. Fulcher noted a diagnosis of somatoform disorder in January 2006 (Tr. 465) and included somatoform disorder on an undated permanent "problem" list (Tr. 468), he did not describe the basis for his diagnoses, did not provide support for his diagnoses (clinical and laboratory diagnostic techniques), and did not describe any limitations based on his diagnoses. After 2006, Dr. Fulcher never mentioned this disorder. Further, in June 2006, Dr. Fulcher stated that Plaintiff did not exhibit any limitation in function due to a mental condition. He also noted that Plaintiff had intact thought processes and appropriate thought content. Tr. 624. Plaintiff argues that her seizures are sufficient evidence to meet the "A" criteria of § 12.07. Plaintiff's Brief at 13-14. Plaintiff's treating

16

physicians, however, never described her seizures as "nonorganic" (i.e. non-epileptic) and at times noted that the epileptic seizures resulted from her stroke in 1987. See Tr. 401, 475, 489, 495, 497, 506, 515, 564, 1191, 1408, 1420, 1479. Although the ALJ did not make a specific § 12.07 analysis, she noted (in discussing whether Plaintiff's somatoform disorder was a severe impairment) that Plaintiff did not meet four of the five criteria (a history of somatic symptoms prior to age thirty, pain in at least four different sites in the body, two gastrointestinal problems other than pain such as vomiting or diarrhea, one sexual symptom such as lack of interest or erectile dysfunction, and one pseudoneurological symptom similar to those seen in a conversion disorder such as fainting or blindness) not related to any medical condition which are outlined in the DSM-IV (American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders Fourth Edition). Although not identical to the § 12.07 "A" criteria, they are similar. That Plaintiff did not meet this Listing is also supported by the opinions of the State agency physicians (Drs. Von and Vidic), who concluded that Plaintiff did not meet any of the criteria. Tr. 625, 631, 1459, 1465.

Even if Plaintiff could show that she met or equaled the "A" criteria of § 12.07, she fails to show that she meets the "B" criteria. The ALJ specifically discussed whether Plaintiff met these criteria in her analysis of whether Plaintiff's somatoform disorder was a severe impairment. See Tr. 12-13. Although Plaintiff expressed agitation to her treating physicians on two occasions (Tr. 463, 1590), her physicians generally described her mood and affect as normal, pleasant, or euthymic. Dr. Fulcher specifically stated in June 2006 that Plaintiff did not exhibit any limitation in function due to a mental condition and that she had intact thought processes; appropriate thought content; normal mood and affect; and good attention, concentration, and memory. Tr. 624. The State agency psychiatrists assessed Plaintiff with only mild difficulties in maintaining social functioning; no

restrictions in daily activities; no difficulties in maintaining concentration, persistence, or pace; and no episodes of extended duration decompensation. Tr. 635, 1469.

    B.    <u>Combination of Impairments</u>

        Plaintiff asserts, as part of her Listing argument, that the ALJ failed to properly consider her combination of impairments. The Commissioner argues that the ALJ properly considered Plaintiff's combination of impairments and that Plaintiff's argument fails because Plaintiff has not shown that her impairments met or equaled all of the criteria for the Listing at § 12.07.

        In evaluating a claim for disability insurance benefits, the Commissioner is required to consider the combined effects of a claimant's impairments, and must adequately explain his evaluation of the combined effect of those impairments. <u>Walker v. Bowen</u>, 889 F.2d 47, 50 (4th Cir. 1989); <u>Hines v. Bowen</u>, 872 F.2d 56 (4th Cir. 1989); <u>Reichenbach v. Heckler</u>, 808 F.2d 309, 312 (4th Cir. 1985). These factors are mandated by Congress' requirement that the Commissioner consider the combined effect of an individual's impairments, 42 U.S.C. § 423(d)(2)(B), and the general requirement by the courts that an ALJ explicitly indicate the weight given to all relevant evidence. <u>Murphy v. Bowen</u>, 810 F.2d 433, 437 (4th Cir. 1987); <u>see also</u> <u>Hines</u>, 872 F.2d at 59. "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p.

        The ALJ properly considered all of Plaintiff's impairments (severe and non-severe) and their combined effects. She specifically found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. Tr. 13-14. The ALJ specifically discussed all of Plaintiff's severe and non-severe impairments in the "Findings of Fact

and Conclusions of Law" section of her decision.  See Browning v. Sullivan, 958 F.2d 817, 821 (8th

Cir. 1992)(ALJ sufficiently considered impairments in combination where he separately discussed

each impairment, the complaints of pain and daily activities, and made a finding that claimant's

impairments did not prevent the performance of past relevant work).

The ALJ also considered Plaintiff's limitations from her combination of impairments in the

hypothetical to the VE.  Specifically, the ALJ asked the VE to consider a claimant of Plaintiff's age,

education, and work history who could read, write, add, and subtract with the limitations that she

could only perform sedentary work; could only stand and walk for only fifteen to thirty minutes at

a time; must avoid uneven surfaces; could only occasionally climb stairs and ramps; must avoid

ropes, ladders, and scaffolds; must avoid concentrated exposure to extremes of heat and cold; must

avoid fumes, odors, gases, and poor ventilation; must  avoid any pulmonary irritant in excess of that

in an office setting, and must avoid hazards and unprotected heights.  Tr. 35-38.  In response, the VE

identified a significant number of sedentary, unskilled  jobs that such a claimant could perform

(machine tender, inspector, and final assembler).  Tr. 38.

    C.    Consultative Examination

Plaintiff argues that the ALJ erred in not ordering a consultative psychiatric

examination.  She  again argues that she possibly has a somatization disorder and that there is strong

evidence that she meets the Listing at § 12.07.  She appears to argue that she was unable to afford

comprehensive treatment.  The Commissioner contends that the ALJ was not required to order a

consultative examination regarding Plaintiff's somatoform disorder.

Ordering a consultative examination is within the discretion of the ALJ.  See Sims v. Apfel,

224 F.3d 380, 381 (5th Cir.2000); see also Skinner v. Astrue, 478 F.3d 836, 844 (7th Cir. 2007);

Bishop v. Barnhart, 78 F. App'x 265, 268 (4th Cir. 2003)(unpublished)(noting the ALJ's discretion in ordering a consultative examination, and upholding an ALJ's decision not to order a psychological consultative examination because the decision was supported by sufficient evidence as the ALJ considered statements by the claimant's treating physician, a licensed psychologist, state agency psychologists, and notes from other agencies); see generally 20 C.F.R. §§ 404.1519, 416.919. "The decision to purchase a consultative examination ... will be made after [the ALJ] [has] given full consideration to whether the additional information needed (e.g., clinical findings, laboratory tests, diagnosis, and prognosis) is readily available from the records of [a claimant's] medical sources." 20 C.F.R. §§ 404.1519a(a), 416.919a(a). Pursuant to the regulations, however, a consultative examination is normally required, inter alia, where "[a] conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved" or "[t]here is an indication of a change in [a claimant's] condition that is likely to affect [his] ability to work ." 20 C.F.R. §§ 404.1519a(b), 416.919a(b).

Here, the State agency psychologists both described Plaintiff's mental impairments and limitations as non-severe and as resulting in only mild difficulty in maintaining social functioning. Tr. 625, 635, 1459, 1462, 1469. Dr. Fulcher, Plaintiff's long-time treating physician[7] opined in June 2006 that Plaintiff did not suffer any limitations from a mental condition. Tr. 624. No other treating or examining physician opined that Plaintiff suffered from any mental disorder, she never sought psychiatric treatment, and her treating and examining physicians never opined that she required a psychiatric evaluation or treatment. During a consultative physical examination in January 2008,

---

[7]Plaintiff began seeing Dr. Fulcher in 1995, and was her primary care physician through at least February 2009. Tr. 1217, 1607.

the examining physician noted that Plaintiff was "oriented to person, place, and time" and was "capable of handling her own personal financial and legal affairs." Tr. 1449. Although Plaintiff appears to argue that she could not afford mental health treatment because she lost her Medicaid coverage, she does not appear to have lost that coverage until approximately April 2008 (see Tr. 1519), more than six years after her alleged onset date. Plaintiff refused an offer of psychiatric follow up in 2002. Tr. 922. Further, as noted by the ALJ, Plaintiff was aware of and took advantage of several low-cost or no-cost treatment providers in the community. Tr. 16, 1636. Additionally, Plaintiff's treatment record is extensive and includes referrals to numerous specialists including a neurologist, cardiologist, a pulmonologist, and an otolaryngologist, as well as numerous objective tests including EEGs, MRIs, pulmonary function testing, and CT scans.

## CONCLUSION

Despite Plaintiff's claims, she fails to show that the Commissioner's decision was not based on substantial evidence. This Court may not reverse a decision simply because a plaintiff has produced some evidence which might contradict the Commissioner's decision or because, if the decision was considered de novo, a different result might be reached.

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, Richardson v. Perales, supra. Even where a plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision, Blalock v. Richardson, supra. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. Shively v. Heckler, supra. It is, therefore,

21

RECOMMENDED that the Commissioner's decision be **affirmed**.

Joseph R. McCrorey
United States Magistrate Judge

January 30, 2012
Columbia, South Carolina